1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

11   ELAINE SERVANTEZ, guardian ad
     litem for A.D.L. (male), a              NO. 2:07-cv-0661 FCD JFM
12   minorm and A.G.L. (female),             (Consolidated Cases)
     minor; LORRAINE SERVANTEZ,
13

14            Plaintiffs,

15        v.                                 MEMORANDUM AND ORDER

16
     COUNTY OF SACRAMENTO, et al.,
17
              Defendants.
18   _____/

19                          ----oo0oo----

20        This matter is before the court on defendants', County of

21   Sacramento (the "County"), Brian Moore ("Moore"), Wayne Kitade

22   ("Kitade"), Gregory Sokolov, M.D. ("Sokolov"), and Mark Sussman,

23   LCSW (Sussman), motion for summary judgment or, in the

24   alternative, for summary adjudication pursuant to Federal Rule of

25   Civil Procedure 56.[1]  Plaintiffs Elaine Servantez, as guardian ad

26

27        _____
              [1]   Defendants County, Moore, and Kitade and defendants
28   Sokolov and Sussman filed separate motions for summary judgment.
     The court addresses all defendants' motions together.

                                    1

litem for A.D.L. and A.G.L., and Lorraine Servantez oppose the motions.[2]  For the reasons set forth herein,[3] defendants' motion for summary judgment is GRANTED.

### BACKGROUND[4]

This is a consolidated civil rights action brought pursuant to 42 U.S.C. § 1983 and alleging supplemental state claims arising out of the suicide of David Lopez ("Lopez"), an inmate at the Sacramento County Jail (the "Jail"), on April 7, 2005.  Lopez had three children, plaintiffs A.D.L. and A.G.L. as well as Rachel Tolusa.  Plaintiff Lorraine Servantez is Lopez's mother.

Defendant Lieutenant Kitade was assigned to the Jail from November 2004 through May 2005.  (UF ¶ 205.)  Defendant Deputy Moore has worked at the Jail since 2004.  (Decl. of Brian Moore ("Moore Decl.") [Docket # 66], filed Apr. 29, 2009, ¶ 5.) Defendant Sokolov is an employee of the Regents of the University of California, and at all relevant times, was the Medical

---

[2]     On May 27, the court entered an order, upon the parties' stipulation, granting leave to join Astrid Tolosa, as guardian ad litem for Rachel Tolusa, as a plaintiff in this matter.  (Order [Docket # 83], filed May 27, 2009.)

[3]     Because oral argument will not be of material assistance, the court orders this matter submitted on the briefs. E.D. Cal. L.R. 78-230(h).

[4]     Unless otherwise noted, the facts recited herein are undisputed.  (See Pls.' Statement of Undisputed and Disputed Material Facts ("UF") [Docket # 77], filed May 18, 2009; Reply to Opposition to Separate Statement of Undisputed Material Facts ("RUF") [Docket # 79-2], filed May 22, 2009; Reply to Pls.' Statement of Disputed Material Facts ("RDF") [Docket # 79-3], filed May 22, 2009).  Where the facts are in dispute, the court recounts plaintiffs' version of the facts.

To the extent plaintiffs characterize facts as disputed without any citation to or support from evidence submitted, the court will consider such facts to be undisputed.

Director for the Jail Psychiatric Services ("JPS").  (UF ¶ 8; RUF ¶ 4.)  Defendant Sussman is also an employee of the Regents of the University of California and a clinician within the JPS program.  (RUF ¶¶ 3, 5.)

## A.  Policies at the Sacramento County Jail

In the spring of 2003, the reorganization of Jail Health Services resulted in the transfer of administrative responsibility for inmate health care to the Sacramento County Sheriff's Department.  (UF ¶ 6.)  During the period of Lopez's incarceration, Lou Blanas served as Sheriff of Sacramento County.  (UF ¶ 1.)  Beginning in May 2004, the day-to-day operations of the Jail were supervised by Lieutenant Stephen Bunce, Assistant Commander of the Jail.  (UF ¶ 2.)  During all relevant times, the County contracted with the Regents of the University of California to have U.C. Davis Medical Center provide mental health services for inmates housed at the Jail.  (UF ¶ 7.)

The Jail was divided into separate housing units. (UF ¶ 9.) Generally, on floors three through eight, the floor was divided into two housing units, one on the east side and one on the west side.  (UF ¶ 9.)  Eight East is used to handle those newly assigned to the Jail during the classification period and  those awaiting a more permanent housing assignment.  (UF ¶ 9.)  Eight West is used to house male disciplinary problems and others requiring maximum security precautions.  (UF ¶ 9.)  Housing units for general population prisoners were assigned two deputies who work twelve hour shifts.  (UF ¶ 10.)

The second floor of the Jail houses a medical facility for those who require more direct access to nursing care, an

3

1  inpatient psychiatric unit, and a subacute care housing unit.

2  (UF ¶ 12.)   The psychiatric unit consists of single cells with

3  windowed doors that face a hallway fronted by a nurses' station.

4  (UF ¶ 14.)   The psychiatric unit is staffed 24 hours a day with

5  licensed health care providers.   (UF ¶ 11.)   An Outpatient

6  Psychiatric Unit is located on 3 East, which is used to house

7  inmates with mental health issues that do not rise to the level

8  that requires inpatient care, but require an intermediate level

9  of mental health services.   (UF ¶ 16.)

10     Housing assignments at the Jail are based on various

11  factors, including physical and mental disabilities, behavioral

12  issues, security risks, and general safety considerations.   (UF ¶

13  79.)   The General Population housing is designated for inmates

14  that do not require classification into a special category of

15  housing, such as special handling inmates, high security housing,

16  disciplinary housing, special housing, and inmate workers.   (UF ¶

17  80.)   A Total-Separation ("T-Sep") inmate is someone who is

18  segregated from other inmates generally for his safety or the

19  safety of other inmates or staff; this classification is not used

20  for punishment.   (UF ¶ 84.)[5]   This classification requires

21  placing the inmate in a single cell to prevent contact with other

22  /////

23

24     [5]   Plaintiffs cite Dr. Hayward's expert report as
supporting their assertion that "such housing is abused and too
25  often used as punishment for the mentally ill such as David Lopez
by failing to distinguish mentally ill conduct from safety
26  threats."   (See UF ¶ 84.)   The cited evidence does not support
this assertion.   Rather, at most, it surmises that "it is
27  difficult to avoid the conclusion that the move [of Lopez] to
Total Separation was primarily a punitive response to his
28  emotional outbursts."   (Pls.' Ex. 1, filed May 18, 2009, at 8.)
This opinion is not as far-reaching as plaintiffs contend.

4

inmates.  T-Sep inmates must be supervised by custody personnel
for all visits and out-of-cell movements.  (Frenette Decl. ¶ 12.)

Housing unit checks are required by Jail policy.  The checks
are required to be performed every hour during a shift.  The
policy requires direct visual observation of each inmate in the
housing unit.  (UF ¶ 85.)  After 2002, the protocol for
monitoring inmates on the acute psychiatric unit was revised from
one hour to 30 minute checks.  (UF ¶ 86.)  These observations may
be increased to constant or 15 minute intervals depending on the
degree of risk.  (UF ¶¶ 88-89.)  Cell checks in "special housing"
remained at one hour intervals.  (See UF ¶ 87.)

The Jail is staffed with registered nurses who conduct a
face-to-face assessment and screening of those brought to the
Jail to determine whether or not the inmate is "fit for
incarceration."  (UF ¶ 17, 46.)  The nurses who conduct the
screening ask questions regarding the health history of the
inmate, and the inmate is required to complete a self health
history form.  (UF ¶¶ 47-48.)  If the nurse determines that the
inmate has been receiving mental health treatment or psychiatric
medications, a referral is made to JPS for follow-up, and the
screening form is faxed directly from the screening area.  (UF ¶
51.)  If the nurse determines that the inmate is currently
suicidal, the inmate is referred directly to JPS for immediate
evaluation.  (UF ¶ 52.)

Housing officers are also trained and required by policy to
immediately take the necessary steps to safeguard any inmate who
the officer believes is in immediate danger of harming himself.
In that circumstance, the housing officer is required to remove

the inmate from his cell and either handcuff the inmate and place
the inmate in a cell that permits direct observation or otherwise
secure the inmate so that he may be observed while help is
summoned.  Housing officers are trained to and required by policy
to make an immediate referral to JPS in the event that the
officer becomes aware of an imminent threat of self-harm to the
inmate.  (UF ¶ 18.)[6]  Jail staff is required to immediately
advise JPS of suicidal behavior.  (UF ¶ 72.)

     In 2002, there was an increased number of inmate suicides at
the Jail.  (UF ¶ 19.)  In response, the Sheriff at the time
impaneled a Suicide Prevention Task Force (the "Task Force"), a
multi-disciplinary committee consisting of representatives from
custody, JPS, Correctional Health Services, and members of the
community.  (UF ¶¶ 20-21.)  Between March and December 2002, the
Task Force met on multiple occasions to study virtually every
aspect of the Jail and Jail operations to determine what
improvements might be made to lessen the risk of inmate suicide.
(UF ¶ 24.)  Lindsay Hayes ("Hayes"), a nationally renowned expert
in the field of suicide prevention in jails, was asked to assess
the practices at the time and to make recommendations regarding
improvement in suicide prevention policies and procedures.  (UF ¶
25.)  Hayes issued a comprehensive report of his findings.  (UF ¶
26.)  The Task Force created a corrective action plan,
implementing some of the recommendations in the report.  (UF ¶
28.)  Although Hayes recommended increased cell checks in
"special housing" at 30 minute intervals, the Task Force

---

[6]     Plaintiffs dispute this fact.  However, none of the
cited evidence presents a material issue of fact.

6

determined that this change would require significant additional staff that could not be accommodated within the budget. (UF ¶ 87.)

In response to the corrective action plan, suicide prevention training was increased. (UF ¶ 31.) Within the basic academy training for the Sacramento County Sheriff's Department, all new deputies receive an 8-hour block training on mental health and suicide prevention with a 2-hour block in the Jail Operations portion of the academy training. (UF ¶ 33.) Further, during the Correctional Officers Basic Training Academy Course, deputies receive a 2-hour block on suicide prevention, which include a review of the Sheriff's policies on suicide prevention as well as an informational booklet. (UF ¶ 34.) Once a deputy is assigned to work in the Jail, the deputy is assigned a jail training officer, who works side by side with the trainee for eight to twelve weeks. (UF ¶ 35.) JPS provides in-service training sessions for custody, medical and psychiatric staff, including a detailed discussion of suicide risks and typical signs and manifestations. (UF ¶ 38.) All staff are provided with ongoing updates on current suicide risks and trends during briefings and at staff meetings four times a year. (UF ¶ 39.) Starting in 2003, the medical and psychiatric departments began to participate in Advanced Officer Training, which includes training in suicide prevention, mental health issues, and substance abuse withdrawal specific to a custody setting. (UF ¶ 40.) A "Suicide Risk" information pocket card for officers and corrections health staff was developed by JPS and issued to all personnel. (UF ¶ 44.)

7

JPS policy requires follow up on all Acute Psychiatric Unit discharges.  At that point, staff determines the level of continuing care required.  Inmates discharged from the inpatient unit receive follow-up care within 7 days of discharge and on-going follow-up based on the patient's needs.  Patients on medication are seen regularly by the psychiatrist for assessment and on-going care.  Clinicians may also set follow up schedules based on the particular patient's needs.  (UF ¶ 91).[7]

**B.   Facts Surrounding Lopez's Treatment**

Lopez was originally received at the Sacramento County Jail on October 8, 2003, following his arrest for charges of "endangering life or health of child."  (UF ¶ 133; Decl. of Gregory Sokolov, M.D. ("Sokolov Decl.") [Docket # 63-7], filed Apr. 28, 2009, ¶ 4.)  The arrest was based on alleged physical abuse of his six year old daughter.  (UF ¶ 134.)

On October 9, 2003, Lopez was referred by Medical Intake to Jail Psychiatric Services Outpatient Department Triage Contact.  (Ex. X to Sokolov Decl. at 66.)  Lopez answered "no" to all questions related to suicidal behavior and mental illness; however, it was noted that he was referred based upon "psych. illness +/or history" and that he had been diagnosed with "PTSD/anxiety D.O."  (UF ¶ 135; Ex. X to Sokolov Decl. at 66.)  Lopez was referred to the JPS outpatient department due to his history of psychiatric illness.  (UF ¶ 136.)  Following a consult

---

[7]     Plaintiffs dispute this fact, essentially arguing that the follow-up procedures applied to Lopez were insufficient and amounted to no ongoing follow-up.  (See UF ¶ 91.)  However, they fail to present any evidence to raise a genuine issue as to this fact.

1  with JPS staff, Lopez was cleared for admission and placed in

2  Housing Unit 8E.  (UF ¶¶ 137-38.)

3         On October 16, 2003, after attending a custody hearing in

4  the Family Law Court regarding his children, Lopez remarked, "Why

5  don't you just shoot me?"  (RUF ¶ 24; UF ¶ 139.)  Custody

6  immediately referred him to JPS, and a JPS clinician saw him a

7  short time thereafter.  (RUF ¶ 24.)  The clinician felt that he

8  had an increased level of potential for suicide and referred him

9  for a further evaluation (a "5150 evaluation").  (RUF ¶ 24.)

10 After waiting for a bed to become available, on October 17, 2003,

11 Lopez was taken to the JPS inpatient unit ("2P") where he was

12 assessed by a psychiatrist, placed on a 5150 hold, given a past

13 prescription for Remeron, and checked on every 15 minutes.  (RUF

14 ¶ 25; UF ¶ 143.)  The involuntary hold was reportedly based upon

15 Lopez's vagueness about being suicidal and statements he made

16 that he had nothing to live for.  (Ex. X to Sokolov Decl. at

17 105.)  Lopez was also required to wear a safety suit.  (RUF ¶

18 25.)  The following day, he was able to wear his own clothes, and

19 after two days, he was released back into the Jail's general

20 population at his own request and after Dr. Seaman of JPS

21 observed that he continued not to display any suicidal ideation

22 or self-injurious behaviors.[8]  (RUF ¶ 25; Sokolov Decl. ¶ 6.)

23 Lopez's diagnosis at the time was an adjustment disorder.

24 (Sokolov Decl. ¶ 6; UF ¶ 145.)

25 /////

26

27        [8]   It was revealed that Lopez had previously been treated
   with an anti-depressant and that he had been hospitalized as 5150
28 status in 1999 after a family conflict.  (UF ¶ 144.)

One week following his discharge, Lopez was seen by Nancy Harnett, MSW; Lopez indicated that he was "hanging in there," felt fine, and did not have any suicidal or homicidal ideation. (Sokolov Decl. ¶ 7.)  Two days later he was seen by JPS psychiatrist Dr. Cameron Quanbeck; Lopez stated that "he was never really suicidal" when he was sent to 2P and that he was not currently suicidal because he was working to see his kids.  (Ex. X. to Sokolov Decl. at 59.)  Lopez also requested that his Remeron dosage be increased, and it was.  (Sokolov Decl. ¶ 7.)  A month later, Lopez was again seen by Dr. Quanbeck, who noted that Lopez was still having problems with irritability, mood swings, and frustration.  (Sokolov Decl. ¶ 8.)  Lopez requested and received Paxil, an anti-anxiety agent.  (Sokolov Decl. ¶ 8.)  He also denied any suicidal ideation.  (Sokolov Decl. ¶ 8.) Plaintiff was unavailable for his next appointment on December 23, 2003 due to a court appearance.  (Sokolov Decl. ¶ 9.)

On December 29, 2003, Lopez submitted a request for psychiatric services (a "kite"), which provided:

> Getting violent urges.  Frustrated.  I need reading material every week.  I need to keep my mind busy reading.  If I don't stay busy, I hear voices and + I tent to get violent urges while being frustrated + upset.  Please give me a book every week to read.  Our pod worker doesn't have any books.  Every one else is greedy.  I ask for books but no luck even getting more mad.

(Pls.' Ex. 17 at CTY_00178.)  Lopez was referred to JPS for an assessment, which was performed that day.  (RUF ¶ 16.)  The assessment provided that Lopez was frustrated and stressed by being in jail and because of family issues, but that he was calm and responsive.  (Ex. X to Sokolov Decl. at 58.)  The assessment

also provided that he denied suicidal or homicidal ideation and that he was focused on getting reading materials to help him cope.  (Ex. X to Sokolov Decl. at 58.)

Sokolov saw Lopez six days later on January 5, 2004. (Sokolov Decl. ¶ 10.)  Lopez stated that he was doing all right and that his medications were helping, but that he wanted his Paxil dose increased; it was.  (Sokolov Decl. ¶ 10.)  Lopez denied any suicidal or homicidal ideation.  (Sokolov Decl. ¶ 10.) In a follow-up appointment one month later, on February 3 2004, Lopez indicated that his medications were helping, but he was still getting angry for no reason.  (Sokolov Decl. ¶ 11.) However, he denied any suicidal or homicidal ideation.  (Sokolov Decl. ¶ 11.)

On February 4, 2004, custody referred Lopez to JPS after he purportedly had not received his medications and was threatening to harm other people.  The JPS clinician noted that Lopez had received his Remeron, but claimed to have not received his Paxil. The clinician obtained Lopz's agreement to notify JPS if he did not receive his evening dose of Paxil.  She found no evidence of suicidal or homicidal ideation.  (Sokolov Decl. ¶ 12.)

Over the months between March and September 2004, Lopez met with JPS psychiatrists at least three times; he reported that he was doing pretty well, but requested changes in his dosage of Remeron.  (Sokolov Decl. ¶ 13; Ex. X to Sokolov Decl. at 54-55.) He consistently denied suicidal ideations.  (Sokolov Decl. ¶ 13.)

On October 1, 2004, Lopez submitted a kite to JPS indicating that he wanted stronger medications.  Specifically, the kite provided:

11

> Currently on Remeron & Paxil.  I need something
> stronger to stabilize my emotions.  I have ultimate
> highs & ultimate lows in spurts thats uncontrollable,
> resembling something as being bi-polar.  I need more
> stronger medication to level me balanced.  I say & do
> things I don't mean.  I get very mad for little things.
> I get very depressed for everything.  I'm scared of
> saying things I don't mean.

(Pls.' Ex. 17 at CTY_00176).  Lopez was scheduled for clinic on

the first available non-emergent date, October 27, 2004.

(Sokolov Decl. ¶ 13.)  However, on October 14, 2004, Lopez wrote

a second kite complaining about the delay:

> Believe I'm bi-polar.  I always have extreme his, then
> extreme lows, can never be stable.  I get very upset,
> angry, say things to people I love I don't mean, push
> people away that I need, my emotions are unstable,
> uncontrollable.  I need more medication, stronger.
> This is the second kite, what do I gotta do to be seen,
> jump off the top tier?  Somebody, please!  Been a month
> already.

(Pls.' Ex. 17 at CTY_00176; see RUF ¶ 28.)

When the kite arrived, Lopez was scheduled to be seen by a

clinician as soon as possible, which was October 20, 2004.  The

clinician's evaluation was that Lopez was unwilling to exercise

control over his behavior toward his family and that he was

impulsive.  Lopez again denied any suicidal ideation.  (Sokolov

Decl. ¶ 13.)  On October 27, 2004, Lopez met with Sokolov in the

clinic.  Lopez advised Sokolov of the same symptoms set forth in

his kite, but denied any suicidal ideation.  Sokolov prescribed

him a mood stabilizer, Depakote, and scheduled him to return to

the clinic in a month.  (Sokolov Decl. ¶ 14; see RUF ¶ 28.)

Five days later, Lopez began indicating to the correctional

health nurses that he was not going to take the Remeron, but

wanted an increase in his doses of Depakote and Paxil.  On

November 4, 2004, Lopez wrote a kite to this effect. (Sokolov Dep. ¶ 15; Pls.' Ex. 17 at CTY_00175; see RUF 29.) As a result of the kite, Lopez's clinic appointment was moved up three weeks to November 12. He was also immediately interviewed by JPS clinician, Mark Hopkins, RASW. In the interview, he indicated that wanted to stop taking Remeron because it made him drowsy and requested another drug, Wellbutrin.[9] While Lopez stated that he felt some depression and had occasional difficulty with impulse control, he also felt he was generally improving. Hopkins found no suicidal or homicidal ideation. (Sokolov Decl. ¶ 15; see RUF ¶ 29.)

Sokolov met with Lopez on November 12, 2004. Sokolov ordered that the Remeron be discontinued and that the doses of both Depakote and Paxil be increased. Lopez denied any suicidal or homicidal ideation. (Sokolov Decl. ¶ 16.) Sokolov then met with Lopez on December 16, 2004. Lopez wanted his Paxil dosage increased; it was. Sokolov observed that Lopez manifested no signs of suicidal ideation, nor evidence of any type of psychosis. (Sokolov Decl. ¶ 17.)

Over the latter part of December 2004, Lopez submitted additional kites, seeking stronger medication; specifically, more Paxil. (Pls.' Ex. 17 at CTY_00174.) Lopez also voiced these same complaints to Sokolov at his next clinic visit on January 27, 2005. Because Lopez stated that the Paxil kept his depressive symptoms in check, Sokolov ordered that his Paxil dose

---

[9]   In his declaration, Sokolov asserts that Wellbutrin is a drug that is notoriously subject to abuse by incarcerated inmates in all correctional settings. (Sokolov Decl. ¶ 15.)

be maintained and his Depakote dose be increased.  Lopez denied
any suicidal ideation, and Sokolov saw no signs of psychosis.
(Sokolov Decl. ¶ 18.)  Lopez missed his February office visit
with Sokolov due to a court appearance.  (Sokolov Decl. ¶ 19.)

Sokolov next saw Lopez on March 4, 2005.  Lopez informed him
that he was depressed and frustrated because he was not seeing
his children.  However, he indicated that the Depakote had helped
a lot in controlling his mood and that he was sleeping better.
Lopez again denied any suicidal ideation, and Sokolov did not
observe signs or symptoms of such ideation or any psychosis.
Sokolov increased Lopez's dosage and planned to follow up in
three weeks.  (Sokolov Decl. ¶ 19.)

However, five days later, on March 9, 2005, custody
requested that Lopez be assessed by JPS for suicidal ideation.
(RUF ¶ 30.)  Specifically, the referral stated:

> On trial – facing life sentence.  Making statements
> about being better off dead, etc. – will be back from
> court this afternoon – floor officer will notify.

(Pls.' Ex. 17 at CTY_00173; see UF ¶ 151.)  A JPS clinician met
with Lopez on his return to the Jail.  (UF ¶ 152.)  She noted
that Lopez's thought associations were tight and that he denied
suicidal and homicidal ideation at that time.  Further, he stated
that he would hurt someone else before he would hurt himself.
The clinician found that Lopez did not meet 5150 criteria.  (Ex.
X to Sokolov Decl. at 49; UF ¶ 153.)

On March 17, 2005, Tina Frenette, a classification officer
at the Jail, had a telephone conversation with deputies working
in the courtroom during Lopez's trial and reviewed information in
the Jail Information Management System.  (Frenette Decl. ¶ 4.)

14

Deputy Manning's report, provided, in relevant part:

> Inmate Lopex had recently vandalized a tank and a
> hallway with a pencil. . . . I noticed today that Lopez
> had not received a writeup for this violation.   Lopez
> has been housed in the two tank for the last three days
> due to his insubordination and total lack of respect
> for the courthouse rules.   Lopez continues to raise his
> voice and challenge deputies authority and makes
> comments that things would be different if the
> handcuffs were off. . . . At 0920 hours, additional
> officers were called to assist the escort office in
> Dept 25 for an uncooperative inmate (Lopez) that was in
> a verbal argument with his counsel and the judge.
> Lopez also threw several paper items across the table
> toward the direction of the district attorney.   It
> would be my request to have Lopez re-classified to T-
> Sep Status due to his vandalizing cells,
> insubordination, threats toward staff, and unruly
> behavior in court that represents a hazard to the
> judge, staff and the public.   It should also be noted
> that in today's Sacramento Bee Metro Section an article
> describing the nature of his charges (torturing a
> child) was published.   The other inmates have been able
> to identify him as the suspect and have been talking
> about the article.

(County Defs.' Ex. I [Docket # 66], filed Apr. 29, 2009, at CTY

_00152-55.)   Based upon Lopez's behavior, which indicated a lack

of impulse control and an increased threat to staff, other

inmates, and Lopez and the increased risk of danger to Lopez as a

result of the publication of the newspaper article, Frenette

changed Lopez's classification to T-Sep.   (Frenette Decl. ¶¶ 15-

19.)   Frenette did not contact JPS.   (RDF ¶ 22.)

On March 18, 2005, Deputy Pederson entered a report arising

out of rule violations by Lopez.   (Pls.' Ex. 17 at CTY_00156-60.)

The report provides that Lopez admitted to drawing on the walls

and to getting angry in court.   (Pls.' Ex. 17 at CTY_00156-57.)

Lopez also expressed anger at being placed in T-Sep.   (Pls.' Ex.

17 at CTY_00158.)   Deputy Pederson wrote that based upon Lopez's

ongoing disruptive and insubordinate behavior, in light of the

15

need for safety, and given the severity of the situation, Lopez would be belly chained and escorted by two officers when taken into court and that he should be assigned fifteen days full restriction. (Pls.' Ex. 17 at CTY_00160.) The report and the subsequent assignment was reviewed, approved, and implemented by defendant Kitade as the Watch Commander. (Pls.' Ex. 17 at CTY_00160.) Defendant Kitade also reviewed Lopez's appeal of the fifteen days restriction he received as a result of his conduct; he found the discipline was appropriate. (Pls.' Ex. 17 at CTY_00124.)

Due to the classification change to T-Sep, Lopez was relocated to Housing Unit 8E and placed in a single cell. (Decl. of Tina Frenette ("Frenette Decl.") [Docket # 66], filed Apr. 29, 2009, ¶ 20.)[10]  For the first two weeks of his placement in T-Sep, as a result of the disciplinary restrictions placed upon him, Lopez's family was unable to visit him. (RDF ¶ 18.) Lopez remained in T-Sep until the time of his suicide. (RDF ¶ 15.)

On March 24, 2005, Lopez was scheduled to see Sokolov, but was unavailable due to a court appearance. Sokolov rescheduled him to be seen on March 30, 2005, increased his dosage of Depakote, and scheduled him to be seen for a "welfare check" by a JPS clinician in Lopez's housing unit after he returned from court that day. (RUF ¶ 31; UF ¶ 162; see Sokolov Decl ¶ 24.) The clinician noted:

---

[10]     Plaintiffs contend that Lopez was placed in T-Sep as punishment for defecating in his pants in the trial courtroom. However, the deponent who set forth this assertion has no personal knowledge of the reasons Lopez was placed in T-Sep.

1    Seen for welfare check.  Mood is depressed and angry.
2    Thought associations are tight.  He continues to deny
    [suicidal ideation] + state that he would hurt someone
3    else before hurting himself.  Feels that since the
    newspaper article came out (re: his case) custody has
4    "a conspiracy going" which has resulted in his T-Sep
    status on 8E. . . .

5  (Ex. X to Sokolov Decl. at 49.)

6       On March 30, 2005, Sokolov met with Lopez; Lopez stated that

7  he was "hanging in there" and that if he had "to go the pen, I'll

8  do my time like a soldier."  Lopez also specifically denied

9  suicidal ideation, stating "I wouldn't kill myself, I've got

10  young daughters to live for."  (Ex. X to Sokolov Decl. at 48.)

11  Sokolov increased Lopez's dosage of Depakote and specifically

12  instructed him to immediately notify JPS or custody if he

13  experienced any increased anxiety or suicidal ideation during the

14  remainder of his trial.  (UF ¶ 165; Sokolov Decl. ¶ 22.)

15       On April 2, 2005, Lopez submitted a kite to JPS requesting

16  THC pills that he asserted he had been taking since 1999 and that

17  he had been deprived of since his arrest.  (Pls.' Ex. 17 at

18  CTY_00171.)  He was seen by a JPS clinician on April 3, 2005, and

19  counseled regarding how to cope without medical marijuana.

20  (Sokolov Decl. ¶ 23.)  On April 4, 2005, Lopez submitted another

21  kite directly to Sokolov, stating that he needed his marinol

22  pills; he stated that "marinol with get me thru this."  (Pls.'

23  Ex. 17 at CTY_00171.)  In both kites, Lopez stated that he was

24  "drifting to the dark side."  In the April 4 kite, Lopez also

25  stated that he was "going thru a lot mentally since the article

26

27

28

about me in the Bee." (Pls.' Ex. 17 at CTY_00171.)[11]

## C.   Fact Surrounding Lopez's Suicide

On April 5, 2005, Lopez was convicted of numerous counts of physical abuse of his daughter, which carried a possible life sentence. (UF ¶ 166.) The court custody detail referred Lopez to JPS, noting that the "inmate is very violent." (Ex. X to Sokolov Decl. at 10.) A JPS clinician, Hopkins, interviewed Lopez in his housing unit. (Sokolov Decl. ¶ 24.) The notes of the interview provide, in relevant part:

> Seen client after he had been convicted today.  In addition he had sent a kite requesting Marinol stating that he had been prescribed that in the community.
>
> Thought processes linear and goal directed.  Angry mood with congruent affect.  Denies any S/I.  Did talk of killing others if he did not get what he wants.  He said that he wanted his Marinol and if he did not get it then he would start going off on people and hurt someone.  He said the he might as well stab someone if people disrespected him and did not give him what he wants, so he could see what it feels like.
>
> He is expecting to be sentenced to life in prison and stated that he had nothing to lose by "going to the darkside" as he described it.  His goal appeared to be to intimidate others into giving him what he wants.
>
> Unlike in the past, he said that he would hurt others before he would hurt himself; and if he still did not get what he wanted, the he would possibly consider killing himself because he believed he had nothing to lose.  He said that he has lost everything already: his tattoo shop, his woman, his children.
>
> He indicated that he could fashion a weapon easily and would not hesitate to use it if he felt the need.  He figured that he had to prepare himself to live with a bunch of killers in prison.
>
> Does not meet 5150 criteria of DTS or DTO due to a mental disorder at this time.  Informed custody of the

---

[11]   Plaintiffs assert that these kites were not seen by JPS until after Lopez's death. (See RUF ¶ 32.) Plaintiffs fail to cite or submit any evidence in support of this assertion.

18

potential danger that client poses.  Housing per
custody.

(Ex. X to Sokolov Decl. at 47.)

At approximately 7:45 p.m. on April 5, 2005, Lopez had a
visit from his mother and a close cousin, Sandra Trujillo-Perez
("Trujillo-Perez").  (UF ¶ 172; Dep. of Sandra Trujillo-Perez,
("Trujillo-Perez Dep."), Pls.' Ex. 19, filed May 18, 2009, at
64:10-12.)  Prior to the visit, Trujillo-Perez asserts that she
told Deputy Sexton that Lopez needed to be on suicide watch.  (UF
¶ 173; Trujillo-Perez Dep. at 66:3-5.)[12]  During the visit, Lopez
did not say that he was going to commit suicide, but told
Trujillo-Perez he could not promise her that he wouldn't kill
himself.  (Trujillo-Perez Dep. at 82:5-7.)  Subsequently,
Trujillo-Perez asked Lopez what he wanted done if he did commit
suicide.  (Trujillo-Perez Dep. at 82:3-24.)

On the afternoon of April 6, 2005, Sokolov read an article
in the Sacramento Bee concerning Lopez's conviction and the facts
surrounding it.  (Sokolov Decl. ¶ 25.)  Sokolov contacted the JPS
clinicians' offices, spoke to defendant Mark Sussman, LCSW, and
inquired as to whether Lopez had been seen following his
conviction.  Sussman informed Sokolov that Lopez had been seen by
JPS, and read Hopkins' progress note from April 5, 2009,
verbatim.  Sokolov determined that there was no new information
in the newspaper article that was not before Hopkins and no new

---

[12]    Sexton does not recall any conversation where Trujillo-Perez expressed concern about Lopez committing suicide.  (Dep. of Terry Sexton ("Sexton Dep."), Pls.' Ex. 23, filed May 18, 2009, at 44:9-19.)  In fact, Sexton did not work on April 5, 2005, when the alleged conversation took place.  (UF ¶ 175.)

information indicative of any additional risk factors for suicidality or suicidal ideation on Lopez's part. (Sokolov Decl. ¶ 25.)

Sokolov directed Sussman to enter a report in the Jail Information Management System. (Sokolov Decl. ¶ 25.) Sokolov wanted to convey to future custody officers that although Lopez denied suicidal ideation, he had recent episodes of impulsive and angry outbursts in court and was at risk for self-injurious[13] behaviors before transfer to prison. (Sokolov Decl. ¶ 25; Ex Z to Sokolov Decl. at CTY_00145.)

On April 6, 2005, at approximately 7 p.m., Deputy Moore began his shift as a housing officer on 8 East. (UF ¶ 179; Moore Decl. ¶ 14.) At the beginning of his shift he was informed by officers from the previous shift that Lopez had been convicted on various counts of child abuse. (Moore Decl. ¶ 15.) Moore knew Lopez from his time as a housing officer on 3 East where Lopez was housed prior to his classification as T-Sep. Moore respected Lopez as an artist and thought he had a lot of talent. (UF ¶ 182; Moore Decl. ¶ 13.) Although no one ever informed him that Lopez could be suicidal, in light of the court case and the notoriety, Moore and his partner kept watch for signs. (Dep. of Brian Moore ("Moore Dep."), Pls.' Ex. 20, filed May 18, 2009, at 62:1-9.)

Lopez was allowed after hours outdoor recreation, a late evening shower, and several extended telephone calls with his

---

[13] Sokolov defines "self-injurious behaviors" as behaviors in which one might induce harm to oneself without the specific intent to die. (Sokolov Decl. ¶ 25.)

family.  (UF ¶ 180; Moore Decl. ¶ 16.)  At approximately 11:40
p.m., Moore approached Lopez while he was playing basketball on
the recreational floor to inquire how he was doing.  (UF ¶ 181;
Moore Decl. ¶ 17.)  Lopez expressed anger and frustration
regarding his conviction, his legal representation, and the
possibility of facing a life sentence.  (UF ¶ 183; Moore Decl. ¶
18.)  At the outset of the conversation, Lopez stated, "I don't
have anything to live for."  (Moore Decl. ¶ 19.)  However, during
the conversation he told Moore that he had things to look forward
to, like his family and children.  They also discussed Lopez's
options for appeal.  Despite his initial comment, Moore believed
that Lopez expressed determination to see things through and
confidence that things would be okay.  (Moore Decl. ¶ 20.)  Lopez
did not think that Lopez was suicidal or that he wanted to hurt
himself.  (Moore Decl. ¶ 21.)  Moore contends that if he thought
Lopez was expressing doubt about whether he would hurt himself,
he would have placed Lopez in a classroom and referred him to JPS
in the same manner that he placed and referred another inmate
during that same shift.  (Moore Decl. ¶ 29.)

Shortly after midnight on April 7, 2007, Lopez made a phone
call to his aunt, Elaine Servantez, from the Jail.  (RDF ¶ 129.)
Lopez told her that he was very upset about his conviction and
that he did not want to be alone in his cell.  (RDF ¶¶ 130-31.)
It was Elaine Servantez's understanding that Lopez had not read
the most recent Bee article that had been published after the
jury verdict, and she told him not to read it.  (Dep. of Elaine
Servantez ("Servantez Dep."), Pls.' Ex. 20, at 55:14-25.)
/////

At the end of the telephone conversation, Lopez promised to call Elaine Servantez in two weeks.  (Servantez Dep. at 55:4-8.)

At around 1:00 a.m., Lopez made a phone call to Trujillo-Perez.  (RDF ¶ 135.)  Trujillo-Perez was concerned about his state of mind and attempted to reach someone at the attorney hotline and the County jail line.  (Trujillo-Perez Dep. at 88:1-89:17.)  She never got through to anyone.  (UF ¶¶ 189-90; Trujillo-Perez Dep. at 89:1-17.)

At approximately 3:25 a.m. on April 7, 2005, during the course of his required cell checks, Moore observed Lopez on the bunk of his cell.  (UF ¶ 192; Moore Decl. ¶ 23.)  Approximately 50 minutes later, at 4:15 a.m., Moore observed Lopez hanging from a sheet tied to the top bunk of his cell.  (UF ¶ 193; Moore Decl. ¶ 24.)  Moore immediately called for backup and retrieved a cut-down tool from the officer's station.  He removed the ligature from Lopez's neck and placed him on the floor.  (UF ¶ 194; Moore Decl. ¶ 25.)  Life saving measures were performed by other officers and emergency services personnel, but Lopez was pronounced dead at the scene.  (UF ¶ 195; Moore Decl. ¶¶ 26-27.)

**STANDARD**

The Federal Rules of Civil Procedure provide for summary judgment where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see California v. Campbell, 138 F.3d 772, 780 (9th Cir. 1998). The evidence must be viewed in the light most favorable to the /////

nonmoving party.   See Lopez v. Smith, 203 F.3d 1122, 1131 (9th Cir. 2000) (en banc).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of fact.   See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).   If the moving party fails to meet this burden, "the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial."   Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102-03 (9th Cir. 2000). However, if the nonmoving party has the burden of proof at trial, the moving party only needs to show "that there is an absence of evidence to support the nonmoving party's case."   Celotex Corp., 477 U.S. at 325.

Once the moving party has met its burden of proof, the nonmoving party must produce evidence on which a reasonable trier of fact could find in its favor viewing the record as a whole in light of the evidentiary burden the law places on that party. See Triton Energy Corp. v. Square D Co., 68 F.3d 1216, 1221 (9th Cir. 1995).   The nonmoving party cannot simply rest on its allegations without any significant probative evidence tending to support the complaint.   See Nissan Fire & Marine, 210 F.3d at 1107.   Instead, through admissible evidence the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial."   Fed. R. Civ. P. 56(e).

**ANALYSIS**

**I.   42 U.S.C. § 1983**

Plaintiffs have alleged claims under § 1983 against each defendant arising out of the suicide of Lopez.   The impetus of

23

plaintiffs' claims is that various municipal actors caused the wrongful deaths of Lopez.  Plaintiffs allege that defendants' policies, actions, or omissions constituted constitutional violations because defendants were deliberately indifferent to the needs of an inmate who was exhibiting suicidal tendencies.

To state a claim under § 1983, plaintiffs must demonstrate that defendants (1) acted under color of law, and (2) deprived plaintiff of rights secured by the Constitution or federal statutes.  Gibson v. U.S., 781 F.2d 1334, 1338 (9th Cir. 1986).  Defendants do not dispute that they were acting under color of law in regard to the conduct in question.

## A.   Claims against the County of Sacramento

Plaintiffs bring claims against the County of Sacramento on the grounds that (1) it was deliberately indifferent regarding the placement of Lopez in T-Sep; (2) its cell check policy within the T-Sep housing status was deliberately indifferent; (3) its suicide prevention policy as applied to Lopez was deliberately indifferent to his medical needs; and (4) it failed to adequately train its employees who acted with deliberate indifference under the suicide prevention policy.

Because Lopez had not been convicted of a crime for the majority of his incarceration at the Sacramento County Jail, most of the rights implicated by plaintiffs' claim derive from the Fourteenth Amendment due process clause.  Bell v. Wolfish, 441 U.S. 520, 535 (1979); Gibson v. County of Washoe, 290 F.3d 1175, 1187 (9th Cir. 2002).  With regard to medical needs, including detainee's psychiatric needs, "the due process clause imposes, at a minimum, the same duty the Eighth Amendment imposes." Gibson,

290 F.3d at 1187; see also Oregon Advocacy Ctr. v. Mink, 322 F.3d 1101, 1121 n.11 (9th Cir. 2003) (Eighth Amendment deliberate indifference standard is of use in a substantive due process analysis).  The Supreme Court has held that the Eighth Amendment imposes a duty upon prison officials to provide humane conditions of confinement, including ensuring that inmates "receive adequate food, clothing, shelter, and medical care" and "taking reasonable measures to guarantee the safety of the inmates."  Farmer v. Brennan, 511 U.S. 825, 833 (1994) (internal quotations omitted).

"A municipality may be held liable under a claim brought under § 1983 only when the municipality inflicts an injury, and it may not be held liable under a respondeat superior theory."  Gibson, 290 F.3d 1175, 1185 (9th Cir. 2002) (citing Monell v. New York City Dept. of Social Services, 436 U.S. 658, 694,(1978)).  County liability can be established in two ways: (1) direct liability and (2) liability by omission.  Id. at 1186.[14]

### 1.  Direct Liability

To establish direct liability, plaintiff must show "that a municipality itself violated someone's rights or that it directed

---

[14]   While plaintiffs fail to address the two different bases for establishing municipal liability or delineate which theory of liability they are pursuing, the court analyzes those claims that arise out of affirmative acts by the County under a direct liability theory and those arising out of defendant County's alleged policies of inaction under a liability by omission theory.

The court also notes that in their briefing, plaintiffs have failed to set forth with any degree of precision or clarity exactly what policies they are challenging.  As such, the court looks to the opinions of plaintiffs' experts for guidance in addition to viewing the arguments in the light most favorable to plaintiffs.  To the extent plaintiffs' complaints allege liability theories that were not addressed by plaintiffs in their opposition, the court deems these theories abandoned and waived.

its employee to do so." <u>Gibson</u> at 1185 (citing <u>Board of County</u>
<u>Comm'rs of Bryan County v. Brown</u>, 520 U.S. 397, 404,(1994)).   The
County must have (1) had a policy that posed a substantial risk
to plaintiffs and (2) known that its policy posed this risk.   <u>Id.</u>
at 1188.   Moreover, the policy at issue must have been the moving
force behind the claimed constitutional violation.   <u>Chew v.</u>
<u>Gates</u>, 27 F.3d 1432, 1444 (9th Cir. 1994).

### a.   T-Sep Status

### i.   Deliberate Indifference

Plaintiffs assert that the County's policy regarding
classification status was deliberately indifferent and was the
moving force behind Lopez's death.   Specifically, plaintiffs
contend that Lopez's isolation and the failure to inform JPS of
Lopez's change in housing status greatly increased his risk for
suicide.

According to plaintiffs' correctional expert, Daniel Vasquez
("Vasquez"), the County's operation procedures are inadequate in
regards to preventing the suicide of an inmate who suffers from a
mental condition, due in large part because "there is no way to
ensure that the custody staff classifying [an] inmate in T-Sep
status and placing him in total isolation are complying with the
operation orders." (Pls.' Ex. 2, filed May 18, 2009, at 16.)
Specifically, Vasquez opines that the failure of custody to
inform JPS of Lopez's classification change to T-Sep was
"ineffective in relation to supporting a successful suicide
prevention policy." (<u>Id.</u> at 17.)   Vasquez's criticism of the
decision to move Lopez to 8E and classify him as T-Sep was that
JPS would not know where Lopez was or what he was undergoing and

26

that Lopez would not have access to treatment.  (Dep. of Daniel B. Vasquez ("Vasquez Dep.") at 73:15-25.)

Assuming *arguendo*, that plaintiffs can demonstrate that placing mentally ill inmates in T-Sep without contacting JPS poses a substantial risk of increased suicidality and that the County was aware of that risk, plaintiffs fail to present evidence that this policy was the moving force behind Lopez's death.  First, defendants present evidence that JPS was aware of Lopez's classification status in the weeks prior to his suicide.  On March 24, Lopez was seen by a JPS clinician in his housing unit.  The report of that welfare check noted Lopez's complaints about his T-Sep status.  On April 5, another JPS clinician met with Lopez in his housing unit.  The note from that meeting also reflected "Housing per custody."  Second, defendants present evidence that JPS was fully aware of what Lopez was undergoing with respect to his adjudication.  He was seen for a welfare check on March 24 and then by Sokolov on March 30.  During the March 30 appointment, Sokolov instructed Lopez to immediately notify JPS or custody if he had any increased anxiety or suicidal ideation during the course of trial.  Lopez was then seen following his conviction, and Sokolov called to ensure that he had been seen the day following the conviction.  Third, the multiple visits and reports relating to Lopez following his placement in T-Sep demonstrate that he had access to JPS services.  Therefore, to the extent plaintiffs assert that the County had a general policy that allegedly does not provide for communication with JPS regarding classification changes, JPS had actual knowledge of the classification change at issue in this

27

case and continued to provide services to Lopez; thus, such a
policy was not the moving force behind Lopez's death.

Plaintiffs indirectly argue that JPS should have been
informed of Lopez's disciplinary restrictions that were imposed
for the first two weeks of his T-Sep classification; however,
plaintiffs again fail to demonstrate that the failure to convey
these disciplinary restrictions to JPS were the moving force
behind Lopez's death.  As set forth above, JPS staff met with
Lopez on three different occasions after his classification was
changed and after the disciplinary restrictions were imposed.  At
least one of these visits occurred after the restrictions had
been lifted.  At no point during or after the imposition of the
restrictions did any of the JPS staff find that Lopez had
suicidal ideations.[15]  Nor does plaintiffs' expert, Dr. Richard
Hayward ("Hayward"), point to the disciplinary restrictions as a
factor contributing to Lopez's risk of suicide.  (See Decl. of
Dr. Richard Hayward ("Hayward Decl."), Pls.' Ex. 1, ¶ 38.)  As
such, there is no evidence that the failure to communicate the
disciplinary restrictions to JPS was a moving force behind
Lopez's death.

Furthermore, to the extent plaintiffs contend that JPS
should be involved in the determination of whether mentally ill
inmates should be housed in T-Sep, plaintiffs fail to present any
evidence that Lopez would not have been placed in T-Sep had there
been such involvement.  Rather, defendants present evidence that
Sokolov believed that "the T-Sep placement for Mr. Lopez was

---

[15]   Moreover, in the days preceding his death, Lopez had
visits with his family.

28

appropriate from a psychiatric standpoint both on April 5 and April 6, as well as April 7, 2005, as Mr. Lopez was never found to be suicidal by any JPS clinician while he was in T-Sep status." (Sokolov Decl. ¶ 39.)   Therefore, plaintiffs have failed to raise a triable issue of fact that the counties' failure to involve JPS in Lopez's housing classification decision was a moving force behind his death.[16]

### ii. Punitive Conditions of Confinement

Plaintiffs also contend that Lopez's T-Sep classification violated due process because it amounted to punishment of a pre-conviction detainee.

An individual that is accused, but not convicted, of a crime "cannot be subjected to conditions that 'amount to punishment.'" Jones v. Blanas, 393 F.3d 918, 932 (9th Cir. 2004) (quoting Bell, 441 U.S. at 536).   A plaintiff may show that conditions are punitive where (1) "the challenged restrictions are expressly intended to punish;" or (2) "the challenged restrictions serve an alternative, non-punitive purpose but are nonetheless excessive in relation to the alternative purpose or are employed to achieve objectives that could be accomplished in so many alternative and less harsh methods." Id. (internal quotations and citations omitted).   However, if a condition of confinement is reasonably related to a legitimate governmental interest, it may be concluded that the condition does not amount to punishment.   Id. "Legitimate, non-punitive government interests include ensuring a

---

[16]   The court makes no finding regarding whether JPS input into correctional housing classification decisions would be constitutionally required.   Indeed, plaintiffs fail to offer any expert opinions or other evidence on this issue.

1  detainee's presence at trial, maintaining jail security, and

2  effective management of a detention facility." Id.

3      Defendants present evidence that Lopez was placed in T-Sep

4  partly as a result of his behavior, which evidenced a lack of

5  impulse control and increased threat to staff, other inmates, and

6  himself.  Specifically, the classification was based on courtroom

7  custody's report that Lopez had vandalized his cell and the

8  hallway, continued to raise his voice and challenge authority,

9  made threats to the deputies regarding how the situation would be

10 different if he were not handcuffed, argued with counsel and the

11 judge, and threw paper at the district attorney.  Defendants also

12 present evidence that Lopez was reclassified in order to address

13 the increased risk of danger to Lopez as a result of the

14 publication of a newspaper article that detailed the charges

15 against him.  The officer's report also noted that other inmates

16 were able to identify Lopez as the subject of the article and had

17 been talking about it.  As such, defendants' evidence

18 demonstrates that Lopez's placement in T-Sep was reasonably

19 related to the legitimate, non-punitive interest of keeping

20 staff, other inmates, and Lopez himself, safe.

21      Plaintiffs fail to proffer any evidence to raise a triable

22 issue of fact on this claim.[17]  Rather, plaintiffs' expert,

23

24        [17]   Plaintiffs' expert relating to the issues of mental
   health and suicide in the county jail correctional setting,
25 Hayward, opines that "[t]here was no evidence in the depositions
   listed above that provided a convincing rationale as to why David
26 Lopez required isolation in Total Separation. . . . [I]t is
   difficult to avoid the conclusion that the move to Total
   Separation was primarily a punitive response to his emotional
27 outbursts."  (Attachment A to Hayward Decl. at 7-8.)  However,
   this opinion is outside the purview of Hayward's expertise.
28 Furthermore, he has no personal knowledge of the events leading

Vasquez, testified that it would be an appropriate decision by a classification officer to place an inmate who had a violent outburst in a courtroom in a single cell.  (Dep. of Daniel B. Vasquez ("Vasquez Dep.") at 123:7-19.)  Vasquez also testified that an inmate who was charged with abusing a child is at a greater risk of assault by other inmates because of the nature of the charges.  (<u>Id.</u> at 68:13-21.)  Further, Vasquez testified that it would be appropriate for a classification officer to take into account the information set forth in the report provided by Deputy Manning.  (<u>Id.</u> at 84:14-85:4.)  As such, plaintiffs have failed to demonstrate that there is a genuine dispute that Lopez's classification in T-Sep was unconstitutionally punitive.  <u>See</u> <u>Bell</u>, 441 U.S. at 541-42 (1979) (holding that because double bunking served the Government's interest in effectively managing a detention facility, such conditions or restrictions cannot be construed as punishment, particularly in light of the fact that the prisoners were not in such conditions for extended periods of time); <u>cf.</u> <u>Jones</u>, 393 F.3d at 923-33 (holding that there was a triable issue of fact regarding the constitutionality of classifying SVP detainees as T-Sep since a civil detainee is entitled to more considerate treatment than one criminally detained).

Accordingly, defendant County's classification policy does not give rise to a constitutional violation actionable under § 1983 as it was applied to decedent Lopez.  Therefore, defendants'
/////

---

up to Lopez's reclassification.

motion for summary judgment in regards to County liability

arising out of Lopez's classification as T-Sep is GRANTED.

### b.   Cell Checks

Plaintiffs contend that the County's policy of performing

cell checks hourly on inmates in T-Sep was deliberately

indifferent to Lopez's constitutional rights and the moving force

behind his death.  Specifically, plaintiffs' expert, Hayward

opines that increasing cell checks from every 60 minutes to every

30 minutes would have increased the deputies' awareness of the

increased suicide risk level of inmates in special housing and

would have provided additional opportunities for the deputies to

observe David Lopez and initiate an intervention prior to his

suicide.

The evidence is undisputed that Lopez interacted with

custody officers the night of his death and that cell checks were

performed pursuant to policy.  There is no dispute that Lopez had

a substantial interaction with the officer on duty, defendant

Moore, less than five hours prior to when he was found.  There is

also no dispute that Moore conducted a cell check and observed

Lopez at 3:25 a.m., only 50 minutes prior to the next cell check

when Lopez was discovered hanging from his top bunk.

Again, assuming *arguendo*, that plaintiffs can establish that

failure to increase the frequency of cell checks in special

housing posed a substantial risk of increased suicidality and

that the County was aware of that risk, plaintiffs fail to

present evidence that this policy was the moving force behind

Lopez's death.  Plaintiffs' own expert, Hayward, testified that

his teaching materials regarding suicide prevention set forth

32

that complete strangulation for a period of at least four minutes may be sufficient to result in death.  (Dep. of Richard Hayward, Ph.D ("Hayward Dep.") at 42:13-22.)  Further, Hayward also testified that he could not state that Lopez would not have committed suicide had he been checked by Deputy Moore or Taylor fifteen minutes before he was discovered.  (Hayward Dep. at 101:3-7.)  While Lopez may have benefitted from more frequent cell checks, plaintiffs have produced no evidence that the alleged deficient cell check policy contributed to or was a direct cause of Lopez's death.

Therefore, defendants' motion for summary judgment regarding County liability arising out of its cell check policy is GRANTED.

### 2.   Liability by Omission

Alternatively, to establish liability by omission, plaintiffs must demonstrate evidence that (1) a County employee violated plaintiffs' rights; (2) the County has customs or policies that amount to deliberate indifference; and (3) these policies were the moving force behind the employee's violation of plaintiffs' constitutional rights, "in the sense that the County could have prevented the violation with an appropriate policy." Id. at 1194 (citing Amos v. City of Page, 257 F.3d 1086, 1094 (9th Cir. 2001.)  For example, a policy of inadequate police training may serve as the basis for § 1983 liability only where "the failure to train amounts to deliberate indifference to the rights of persons with whom the [officers] come into contact," and where the identified training deficiencies are "closely related" to the plaintiff's ultimate injury.  See City of Canton v. Harris, 489 U.S. 378, 388-91 (1989).

To prove deliberate indifference under a liability by omission theory, "the plaintiff must show that the municipality was on actual or constructive notice that its omission would likely result in a constitutional violation." Gibson, 290 F.3d at 1186.  Deliberate indifference occurs when the policymakers' omission "is so obvious, and the inadequacy so likely to result in the violation of constitutional rights." Canton, 489 U.S. at 390.  "The need to act may be obvious because any reasonable person would recognize the need." Gibson, 290 F.3d at 1195. Deliberate indifference under a liability by omission theory does not contain a subjective component.  Id. (citing Farmer, 511 U.S. at 841).

Finally, a plaintiff must demonstrate that the County's deliberate indifference led to its omission and that the omission caused the employee to commit the constitutional violation.  Id. at 1186.

### 1.   Suicide Prevention Policy

Plaintiffs broadly contend that defendant County's suicide prevention policy is deliberately indifferent to the needs of mentally ill suicidal detainees.  Plaintiffs attack various aspects of the suicide prevention policy.  The court addresses each of these in turn.

### a.   Failure to Identify, Monitor, and Provide Treatment to All Patients Who Pose a Suicide Risk

Plaintiffs contend that defendant County's suicide prevention policy ignores mentally ill suicidal inmates who are

not "imminently suicidal."[18]  Plaintiffs argue that defendant County's failure to identify, monitor, and provide treatment to such detainees was deliberately indifferent and the moving force behind Lopez's death.

Defendants present evidence that after an increase in the number of inmate suicides in 2002, the County empaneled a task force to review all relevant aspects of the Jail operations including training, screening, structural plant issues, environmental issues, emergency procedures, inmate monitoring, management interventions, inmate outreach, and administrative review.  (UF ¶¶ 20-21).  The task force met on multiple occasions to determine what improvements might be made to lessen the risk of inmate suicide.  (UF ¶ 24.)  Further, Hayes issued a comprehensive report that included recommendations, many of which were implemented in 2002.  (UF ¶¶ 26-28.)  Outpatient services are provided by JPS to the inmate population, including suicide prevention, suicide assessment, diagnosis, treatment, stabilization, patient education, crisis intervention, individual counseling, and monitoring of psychiatric medications.  (Sokolov Decl. ¶ 28.)  Crisis services are available to inmates 24 hours a day, 7 days per week, based upon a referral from themselves, custody, family, attorneys, or others.  (Id.)

Defendants also present evidence that Lopez received consistent psychiatric treatment while at the Jail even though he was not deemed "imminently suicidal," as plaintiffs use the term.

---

[18]   In their briefing, plaintiffs state "[t]o be 'imminently suicidal' requires the inmate to threaten suicide at that time."  (Pls.' Opp'n at 5.)

Despite the lack of a stated intention to suicide, Lopez was referred for a 5150 evaluation in October 2003 after making a statement to a custody officer and being evaluated by a JPS clinician.  Lopez continually denied suicidal ideation and later stated that he had never been suicidal.  After his release from acute care, Lopez was seen a week letter by a JPS clinician, two days after that by a JPS psychiatrist, and almost monthly until March 2004.  Between March and September 2004, Lopez was seen by JPS staff at least three times.  Beginning in October 2004, he was seen at least once a month, if not more, up until his suicide in April 2005.  In the month preceding his death, he was seen at least six times by JPS staff and his medication was adjusted.[19]  Indeed, on two of these occasions, court staff referred Lopez to JPS for evaluation based on comments he had made and his conviction.  However, in all of these encounters, Lopez consistently denied suicidal ideation and, at times, told JPS staff that he had reasons to live, specifically to be around for his young daughters.

Plaintiffs present evidence that more detailed evaluations as well as communication of varying risks of suicidality to deputies on duty may have been a better policy for the County to adopt.  (Hayward Decl. ¶¶ 33-34, 40).  However, this evidence is insufficient to substantiate an allegation of deliberate indifference.  Indeed, Hayward testified that there are concerns

---

[19]    The court notes that this undisputed evidence refutes plaintiffs' assertion that Lopez was not given individual treatment.  As such, assuming *arguendo*, that a "formal" individual treatment plan is required, the failure to have one in this case was not the moving force behind any constitutional injury.

expressed by many experts in the field with respect to one method

of executing a graduated risk program, the assignment of safety

suits/smocks.  (Hayward Dep. at 94:6-95:17.)  Hayward also

testified that there is no empirical evidence to support the

contention that the gradation system he advocates is more

effective than the system in place at the Jail.  (Hayward Dep. at

22:12-224:25; <u>see also</u> Decl. of Jeffrey L. Metzner, M.D.

("Metzner Decl."), filed Apr. 29, 2009, ¶ 38 (noting that the

National Commission on Correctional Health has changed several of

its recommendations in recent years, due in part to the lack of

empirical evidence supporting their increased effectiveness)).

Based upon the undisputed evidence, specifically evidence

relating to Lopez's referral to acute care in October 2003,

plaintiffs have failed to demonstrate that defendant County had a

policy of only referring "imminently suicidal" inmates for a 5150

evaluation, at least as applied to Lopez.  Nor have plaintiffs

raised a triable issue of fact that defendant County's policies

denied Lopez treatment for his psychiatric issues or that JPS

failed to inquire into Lopez's potential risk for suicide.

Further, plaintiffs fail to demonstrate that any failure to

implement the increased monitoring and treatment suggested by

plaintiffs' expert was the moving force behind Lopez's death.

Hayward testified that the most difficult suicides to prevent are

those where the inmate expresses no obvious or apparent behavior

or expression that he would commit suicide and where the inmate

is determined to complete the act.  (Hayward Dep. at 73:19-74:2.)

Hayward testified that Lopez never made any verbal or physical

expressions to any staff at the Jail that he intended to commit

suicide and that Lopez had substantial intent to commit suicide.
(Hayward Dep. at 75:24-76:22.)  Moreover, defendant Moore
testified that despite any explicit instructions to do so, he was
keeping watch for signs of suicidality in light of the
circumstances surrounding Lopez's conviction and its publicity.
As such, plaintiffs have failed to raise a triable issue of fact
that the failure of defendant County to have a more nuanced
identification, monitoring, and treatment program was the moving
force behind Lopez's suicide.[20]

### b.   Failure of Communication System within the Jail

Plaintiffs also contend that defendant County's suicide
prevention program was constitutionally insufficient because
there was ineffective communication method between inmates and
JPS and between JPS and custody.

With respect to plaintiffs' argument that there was a lack
of responsive communication between Lopez and JPS, plaintiffs
fail to support such a contention with admissible evidence.
Plaintiffs assert that JPS failed to efficiently follow up on
Lopez's kites.  Plaintiffs refer specifically to Lopez's kite,
written on October 14, 2004, that stated "what do I gotta do to
be seen, jump off the top tier?"  However, the circumstances
surrounding this kite and JPS's response does not evidence a lack
of effective communication and follow-up.  The October 14 kite

---

[20]   Hayward asserts that if the County had adopted a
gradation system, defendant Moore would have received better
training and thus, would have been able to recognize Lopez as a
suicide risk.  Such an assertion of causation is, at best,
speculative.

was a follow-up to a kite written by Lopez on October 1, 2004,
seeking stronger medications.  In response to the October 1 kite,
JPS scheduled the first non-emergent appointment available, which
was on October 27, 2004.  However, after receiving the second
kite on October 14, 2004, Lopez was scheduled to be seen by a JPS
clinician on October 20, 2004, the earliest appointment
available.  Lopez was seen by a JPS clinician on October 20, 2004
and by Sokolov on October 27, 2004.

Plaintiffs then contend that the kites sent by David Lopez
days before his suicide, on April 2 and 4, 2005, were not seen
until after the suicide.  This contention is belied by the
undisputed evidence.  Lopez was seen by a JPS clinician on April
3, 2005, and counseled regarding the subject of these kites.
(See Ex. X to Sokolov Decl. at 8-9.)  The notation on the April 2
kite reads "Seen 4/3" in the "Action Taken" section.  (Ex. X to
Sokolov Decl. at 9.)  The April 4 kite has "4/5" written at the
top and in the "Action Taken" section reads, "Seen on 4/3 and
discussed this issue.  How to cope when does not get Rx for
Marinol."  (Ex. X to Sokolov Decl. at 8.)  Moreover, Lopez was
seen by a JPS clinician on April 5, 2005.  In light of this
evidence, plaintiffs fail to raise a triable issue regarding
constitutional deficiencies in the communication policy between
inmates and JPS as applied to Lopez.

With respect to plaintiffs' argument that there was a lack
of sufficient communication between JPS and custody, plaintiffs
fail to raise a triable issue that any failed communication
generally was a moving force behind Lopez's death in light of the
specific circumstances surrounding custody's role.  Plaintiffs'

correctional expert, Vasquez, opines that the Jail's PF-10 system was ineffective because there is no policy or procedure to guarantee that custody staff at the Jail receive information from JPS about inmates who may run a potential risk of committing suicide.  Vasquez further opines that had deputies Moore and Taylor checked on Lopez's PF-10 file, they would have been alerted of the need to closely monitor Lopez.  However, Moore testified that he was aware of Lopez's circumstances and kept watch for signs.  Indeed, it is undisputed that Moore approached Lopez to inquire how he was doing in light of the conviction and had a conversation with Lopez regarding his family and future. Vasquez himself concluded that Moore knew that if he felt that an inmate was suicidal, he was to safeguard the individual and refer the inmate to JPS, but that Moore did not think Lopez was suicidal.  (Vasquez Dep. at 90:3-22; 91:8-12.)  As such, there is no evidence, despite any failure regarding communication between JPS and custody, that custody was not aware of an increased risk of suicidality or that custody failed to make further inquiries or give special attention to Lopez.  As such, in light of defendant Moore's conduct, plaintiffs have failed to raise a triable issue of fact that any deficiencies in the County's communication policy was a moving force behind Lopez's death.

### c.   Failure to Have a 24-hour Hotline

Plaintiffs also contend that defendant County's suicide prevention program was constitutionally insufficient because the County failed to provide a 24-hour hotline for family to notify it of suicidal intent of an inmate.  Specifically, plaintiffs assert that Trujillo-Perez was unsuccessful in reaching anyone

through either the hotline number displayed in the visitor admission area or through the Jail's direct number.

Plaintiffs fail to submit any evidence to substantiate their claim that defendant County violated constitutional rights by failing to have a 24-hour hotline or that such failure was a moving force behind Lopez's death. None of plaintiffs' experts opine regarding the need for a 24-hour hotline in a suicide prevention program. Further, none of plaintiffs' experts opine that the lack of a 24-hour hotline was the moving force behind Lopez's death. Nor does any of plaintiffs' other submitted evidence support this assertion. As such, plaintiffs have failed to raise a triable issue of fact on this issue.

Accordingly, in light of the evidence submitted by both plaintiffs and defendants, no reasonable juror could find that the County was deliberately indifferent through its suicide prevention policy as it applied to Lopez or that any alleged deficiencies were the moving force behind any constitutional injury. Therefore, defendants' motion for summary judgment for County liability based upon the suicide prevention policy is GRANTED.[21]

/////

/////

/////

----

[21]    In their broad-based attack on the suicide prevention policy, plaintiffs also assert that defendant County's policy fails to meet California Code of Regulations and that defendant County failed to implement quality control followup. However, plaintiffs fail to set forth any argument or evidence, beyond those already addressed by the court, as to why such failures amount to deliberate indifference or how they were the moving force behind the alleged constitutional injury.

41

### 2.   Failure to Train

Finally, plaintiffs contend that defendant County is deliberately indifferent to the needs of mentally ill suicidal detainees based upon its failure to adequately train custody staff to identify and respond to potentially suicidal inmates. Specifically, plaintiffs contend that Deputy Moore failed to refer Lopez to JPS due to inadequate training and such failure was the moving force behind Lopez's death. (See Hayward Decl. ¶ 43.)

A policy of inadequate training may serve as the basis for section 1983 liability only where "the failure to train amounts to deliberate indifference to the rights of persons with whom the [officers] come into contact," and where the identified training deficiencies are "closely related" to the plaintiff's ultimate injury.   See City of Canton v. Harris, 489 U.S. 378, 388-91 (1989).

Defendants present evidence that subsequent to the formation of the task force in 2002, suicide prevention training was increased.  New deputies received training on suicide prevention during basic academy training for the Sacramento County Sheriff's Department and during the Correctional Officers Basic Training Academy Course.[22]  Further, JPS provides in service training sessions for custody officers as well as ongoing updates at staff

---

[22]    Plaintiffs contend that deputies active before 2003 would miss such training.  However, defendant Moore, the deputy whose alleged inaction caused the injury at issue, began working in the Jail in 2004, and there is no indication that he did not receive this training.  Therefore, any failure to train deputies active before 2003 is not the moving force behind the alleged constitutional violation in this case.

meetings during the year.  While plaintiffs's experts contend that defendant County should implement a testing or evaluation process to determine if custody staff was actually learning the material provided and discussed during the training, such opinions do not demonstrate that defendant County's training was constitutionally deficient.

Plaintiffs concede that defendant Moore "was able to recount the risks of suicide in detail at his deposition." (Pls.' Opp'n at 35.)  Plaintiffs' correctional expert, Vasquez, also testified that defendant Moore knew he was to follow JPS referral procedure if he felt an inmate was suicidal.  This is further evidenced by the fact that during their shift on April 6 and 7, 2005, prior to Lopez's death, Moore and Taylor determined that another inmate was potentially suicidal; they removed the inmate from his cell, called JPS for assessment, and safeguarded the inmate until JPS arrived to conduct the assessment. (UF ¶ 203.)  In light of the undisputed evidence and despite plaintiffs' contention to the contrary, Moore's solitary failure to identify Lopez as a suicide risk and to refer him to JPS is insufficient to demonstrate a County policy of inadequate training.

Therefore, defendants' motion for summary judgment in regards to County liability arising out of its training policy is GRANTED.

/////

/////

/////

/////

/////

1      **B.   Claims Against Individual Defendants**[23]

2          In bringing a claim against prison officials under § 1983 on

3      the basis of prison conditions, a claimant must show (1) an

4      objectively, sufficiently serious deprivation and (2) that the

5      prison official had a "sufficiently culpable state of mind,"

6      which in prison condition cases is "one of deliberate

7      indifference to inmate health or safety."  <u>Farmer</u>, 511 U.S. at

8      834.

9          The standard of deliberate indifference is not met "unless

10     the official knows of and disregards an excessive risk to inmate

11     health or safety."  <u>Id.</u> at 837.  In other words, in order for a

12     prison official to be deliberately indifferent, he must "both be

13     aware of facts from which the inference could be drawn that a

14     substantial risk of serious harm exists, and he must also draw

15     the inference."  <u>Id.</u> at 837.  Specifically, plaintiff must first

16     show a serious medical need and then demonstrate that defendant

17     _____

18     [23]    Although they fail to make any distinction in their
       briefing, plaintiffs bring § 1983 claims against the individual
19     defendants in their official and individual capacities.  Official
       capacity suits "generally represent . . . another way of pleading
20     an action against an entity of which an officer is an agent."
       <u>Kentucky v. Graham</u>, 473 U.S. 159, 165-66 (1985) (citing <u>Monell v.</u>
21     <u>New York City Dept. of Soc. Svcs.</u>, 436 U.S. 658, 690 n. 55
       (1978).  To hold defendants liable in their official capacities,
22     plaintiffs must show that a policy or custom or a one time
       decision by a governmentally authorized decision maker played a
23     part in the violation of federal law.  <u>McRorie v. Shimoda</u>, 795
       F.2d 780, 783 (9th Cir. 1986); <u>see</u> <u>Kentucky v. Graham</u>, 473 U.S.
24     159, 166 (1985) ("[I]n an official-capacity suit, the entity's
       policy or custom must have played a part in the violation of
25     federal law.") (internal quotation omitted).  Because, as set
       forth above, plaintiffs have failed to raised a triable issue of
26     fact that any of the complained of policies gives rise to a
       constitutional claim, defendants' motion for summary judgment
27     regarding plaintiffs' claims against the individual defendants in
       their official capacities is GRANTED.  Moreover, it is undisputed
28     that none of the individual defendants were policy-makers.  (<u>See</u>
       RUF ¶¶ 5-10; UF ¶¶ 205-09.)

purposely failed to respond to that serious pain or medical need. Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006).

> Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.

Farmer, 511 U.S. at 842. "[A]n inadvertent or negligent failure to provide adequate medical care down not state a claim under § 1983." Jett, 439 F.3d at 1096 (citations and quotations omitted). "Mere indifference, negligence, or medical malpractice will not support this cause of action." Broughton v. Cutter Labs., 622 F.2d 458, 460 (9th Cir. 1980) (citation and quotations omitted).

In order for individuals to be liable under § 1983, they must have caused the plaintiff to be subjected to a constitutional deprivation; the actions or inactions of individual defendants must be the cause of the plaintiff's constitutional injuries. Gates, 27 F.3d at 1446; Jett, 439 F.3d at 1096 (harm must be caused by the defendant's indifference).

### 1.   Defendant Kitade

Plaintiffs claim that defendant Kitade is liable for constitutional violations based upon his failure to check with JPS before approving Lopez's classification in T-Sep.[24] Plaintiffs contend that Kitade's "disregard for David Lopez's right to receive JPS care, or at least notify JPS," that Lopez

---

[24]   In their opposition, plaintiffs clarify that they are not seeking to hold defendant Kitade liable in his supervisory capacity.

45

was confined in isolation was a moving force behind his death.

As an initial matter, plaintiffs fail to present evidence that defendant Kitade was responsible for Lopez's assignment to T-Sep.  Rather, plaintiffs present evidence that Deputy Frenette made that classification decision.  (UF ¶ 30.)  Defendant Kitade reviewed Pederson's disciplinary recommendation and Lopez's application for appeal, which mentioned his reclassification to T-Sep.  Plaintiffs also fail to present any evidence that defendant Kitade knew of Lopez's mental illness or potential suicidality.

However, even assuming that plaintiffs could set forth evidence that defendant Kitade was deliberately indifferent to a known, substantial risk in his limited role in Lopez's disciplinary punishment, as set forth above in the court's discussion of defendant County's liability relating to its T-Sep classification policy and decision in Lopez's case, plaintiffs have failed to demonstrate that Kitade's failure to notify JPS caused any injury to Lopez.  Again, the undisputed evidence reveals that JPS was aware of Lopez's T-Sep status prior to his suicide and that JPS staff met with Lopez on more than one occasion during and after his disciplinary restrictions and prior to his suicide.  Two of these visits were in Lopez's housing.  As such, plaintiffs have failed to demonstrate that defendant Kitade's failure to notify JPS of Lopez's classification or discipline was the moving force behind any constitutional injury. Therefore, defendants' motion for summary judgment regarding plaintiffs' § 1983 claims against defendant Kitade is GRANTED. /////

### 2. Defendant Moore

Plaintiffs claim that defendant Moore is liable for constitutional violations based upon his failure to refer Lopez to JPS on the night of the suicide.

However, plaintiffs' own evidence demonstrates that defendant Moore was not deliberately indifferent to a substantial risk to Lopez's medical needs.  As noted above, both of plaintiffs' experts concluded that Moore did not think that Lopez was suicidal.  In fact, Hayward testified that Moore's actions in approaching Lopez and talking to him because he had just been convicted of a crime carrying a significant sentence demonstrated concern for Lopez's well-being.  (Hayward Dep. at 82:11-83:17.) Vasquez also testified that Moore's action evidenced some concern about Lopez's welfare.  (Vasquez Dep. at 88:12-23.)  Furthermore, defendants present evidence that Moore was actively concerned about Lopez's mental well-being and was keeping watch for signs of suicidality on April 6 and 7, 2005 due to Lopez's circumstances.  Such undisputed evidence does not raise a triable issue of fact that Moore was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and that he also drew the inference.  See Farmer, 511 U.S. at 837.  Accordingly, defendants' motion for summary judgment regarding plaintiffs' § 1983 claims against defendant Moore is GRANTED.

### 3. Defendant Sokolov

Plaintiffs claim that defendant Sokolov is liable for constitutional violations based upon his failure to examine Lopez or direct defendant Sussman to check on him on April 6, 2005.

47

Specifically, plaintiffs contend that Sokolov "would reasonably be expected to know" that the article published about Lopez's conviction, which Sokolov read on the afternoon of April 6, 2005, "would significantly raise his suicide risk." (Pls.' Opp'n at 27.)

However, plaintiffs fail to raise a triable issue of fact that Sokolov was deliberately indifferent to Lopez's medical needs. It is undisputed that defendant Sokolov contacted the JPS clinicians' office after reading an article about Lopez in the newspaper in order to ensure that Lopez had been seen. After he was informed that Lopez had been seen the night before and after the progress note in his file had been read to him, Sokolov determined that there were no additional risk factors present. Sokolov also directed Sussman to enter a report into the Jail Information Management System. While plaintiffs assert that Sokolov should have had Lopez reassessed by a JPS clinician, on April 6, after reading the article, plaintiffs fail to offer any evidence that the failure to do so was a conscious disregard of a substantial risk to Lopez's medical needs. Rather, defendants present evidence that there was no clinical need to have Lopez reassessed because the Bee article brought no information to light that had not already been presented to and considered by Hopkins the day before. (Metzner Decl. ¶ 39.)

Plaintiffs' argument, bereft of evidentiary support, is that it would have been better if Lopez had been assessed by JPS yet again on April 6, 2005, and that nothing prevented JPS staff from conducting such an assessment. However, even assuming that an additional assessment may have been beneficial, such a contention

48

does not demonstrate deliberate indifference for purposes of §
1983 liability.  Nor does such a contention demonstrate that the
failure to conduct an assessment was the moving force behind
Lopez's death.[25]  Therefore, defendants' motion for summary
judgment regarding plaintiffs' § 1983 claims against defendant
Sokolov is GRANTED.[26]

### 4.   Defendant Sussman

Finally, plaintiffs claim that defendant Sussman is liable
for constitutional violations based upon his failure to examine
Lopez on April 6, 2009.  Specifically, plaintiffs contend that
after Sussman reviewed Hopkins' notes, "he could have looked
further into David Lopez's situation" and that "[n]othing stopped
him from reading the newspaper."  (Pls.' Opp'n at 27.)

---

[25]  As set forth above, plaintiffs' expert admits that
Lopez never made any verbal or physical expressions to any staff
at the Jail that he intended to commit suicide and that Lopez had
substantial intent to commit suicide.

[26]  In the case of a supervisor, "individual liability
hinges upon his participation in the deprivation of
constitutional rights."  Larez v. City of Los Angeles, 946 F.2d
630, 646 (9th Cir. 1991).  This participation may involve the
setting in motion of acts which cause others to inflict
constitutional injury.  Johnson v. Duffy, 588 F.2d 740, 743-44
(9th Cir. 1978).  For the court to hold a defendant liable in his
individual capacity, a plaintiff must demonstrate: (1) that
defendant's "own culpable action or inaction in the training,
supervision, or control of his subordinates" caused the
constitutional injury; (2) that he "acquiesce[d] in the
constitutional deprivations of which [the] complaint is made;" or
(3) that his conduct showed a "reckless or callous indifference
to the rights of others."  See Larez, 946 F.2d at 646 (internal
citations omitted).  It is undisputed that Sussman was not under
Sokolov's direct supervision and that Sokolov was not the
supervisor of any custody officer. (RUF ¶¶ 15-18.)  Furthermore,
as set forth herein, there is no evidence that defendant
Sokolov's actions caused Lopez injury.  Accordingly, to the
extent plaintiffs' assert § 1983 claims based upon supervisory
liability, such claims are without merit and defendants' motion
for summary judgment is GRANTED.

1   Plaintiffs fail to raise a triable issue of fact that

2   Sussman was deliberately indifferent to Lopez's medical needs.

3   It is undisputed that defendant Sussman never personally treated

4   Lopez.  (RUF ¶ 35.)  Sussman's sole contact with the

5   circumstances surrounding Lopez's death was when he received a

6   call from defendant Sokolov, read verbatim the progress note from

7   Hopkins, and make the computer entry Sokolov directed him to.

8   (RUF ¶¶ 41-44.)  There is no evidence that defendant Sussman was

9   aware of facts from which he could draw the inference, and that

10  he did draw the inference, that there was a substantial risk to

11  Lopez's medical needs.  As with defendant Sokolov, even if an

12  additional assessment may have been beneficial, there is no

13  evidence that the failure to conduct such an assessment under the

14  circumstances in this case amounts to deliberate indifference or

15  that such a failure was the cause of Lopez's death.  Accordingly,

16  defendants' motion for summary judgment regarding plaintiffs' §

17  1983 claims against defendant Sussman is GRANTED.

18  **II.   State Law Claims**[27]

19  Plaintiff Lorraine Servantez brings state law claims for

20  negligence and negligent supervision against all defendants.  "In

21  order to establish liability on a negligence theory, a plaintiff

22  must prove duty, breach, causation, and damages."  Conroy v.

23  Regents of Univ. of Cal., 45 Cal. 4th 1244, 1250 (2009).

24  /////

25  /////

26

27       [27]   The court notes that the parties spend little time and
    proffer little authority with respect to plaintiffs' state law
28  claims.

50

### A.   Defendant County of Sacramento

Defendants assert that the County is not liable because California Government Code § 844.6 immunizes it against all claims brought against it for injuries to any prisoner. Specifically, § 844.6 provides "[A] public entity is not liable for . . . [a]n injury to any prisoner." Plaintiff Servantez concedes that the County is immune from their claims of negligence. (Pls.' Opp'n at 38.) Accordingly, defendants' motion for summary judgment regarding plaintiff's state law claims against defendant County is GRANTED.

### B.   Defendant Kitade

In accordance with their § 1983 claims against him, plaintiffs claim that defendant Kitade is liable for negligence based upon his failure to notify JPS that a mentally ill suicidal inmate was being placed in isolation. Assuming plaintiffs could demonstrate that defendant Kitade both owed and breached a duty by failing to notify JPS, for the reasons set forth above, plaintiffs have failed to raise a triable issue of fact that such failure caused Lopez damage. Therefore, defendants' motion for summary judgment regarding plaintiff's negligence claim against defendant Kitade is GRANTED.

### C.   Defendant Moore

Similar to all plaintiffs' § 1983 claims, plaintiff Servantez asserts that defendant Moore is liable for negligence based upon his failure to identify that Lopez was suicidal and refer him to JPS. Under the circumstances, plaintiff's allegations amount to a claim that defendant Moore failed to properly diagnose that Lopez was suicidal. California Government

51

Code § 855.8 provides immunity to public employees from liability
for injuries "resulting from diagnosing or failing to diagnose
that a person is afflicted with mental illness or addiction or
from failing to prescribe for mental illness or addiction."  This
exception does not preclude all liability relating to mentally
ill prisoners as a matter of law; it only immunizes an employee's
failure to diagnose or to prescribe treatment.  <u>Johnson</u>, 143 Cal.
App. 3d at 317.  To the extent plaintiff alleges that defendant
Moore should have realized that defendant was suicidal, defendant
is entitled to immunity.

Furthermore, under the facts of the case, plaintiff has
failed to establish a triable issue of fact that defendant Moore
knew or should have known that Lopez was suicidal and summoned
medical care.  Lopez was seen by JPS staff multiple times in the
days preceding his death, including the day before.  None of
these trained clinicians or psychiatrists thought that Lopez was
suicidal.  Furthermore, both of plaintiff's experts agree that
Lopez never exhibited any behavior or verbal intention to commit
suicide and that Moore did not believe that Lopez was suicidal.
As such, based upon the undisputed evidence and plaintiff's own
expert opinions, defendants' motion for summary judgment
regarding plaintiff's negligence claim against defendant Moore is
GRANTED.

### D.  Defendants Sokolov and Sussman

Finally, plaintiff Servantez asserts that defendants Sokolov
and Sussman are liable for negligence based upon their failure to
assess Lopez on April 6, after they obtained knowledge about the
newspaper article.  As an initial matter, plaintiff has failed to

1  present any evidence that either defendant had a duty to act

2  under the circumstances; again, plaintiff's experts agree that

3  Lopez never exhibited any behavior or verbal intention to commit

4  suicide.   Neither of plaintiff's experts testified or opined that

5  defendants' conduct fell below the relevant standard of care.

6  Further, to the extent that any damage arose out of defendants'

7  failure to diagnose Lopez as suicidal, defendants are immune

8  pursuant to § 855.8.   Therefore, defendants' motion for summary

9  judgment regarding plaintiff's negligence claims against

10  defendants Sokolov and Sussman are GRANTED.

**CONCLUSION**

12      For the foregoing reasons, defendants' motion for summary

13  judgment is GRANTED.

14      IT IS SO ORDERED.

15  Dated: July 15, 2009

16  _____

17  FRANK C. DAMRELL, JR.
    UNITED STATES DISTRICT JUDGE

18

19

20

21

22

23

24

25

26

27

28